# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ASHAWNA D. MILES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-CV-20-JED-JFJ** |
| | ) | |
| **AMERICAN RED CROSS, a/k/a** | ) | |
| **AMERICAN RED CROSS SOUTHWEST** | ) | |
| **BLOOD SERVICES REGION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court is defendant American Red Cross's ("ARC") Motion for Summary Judgment and Brief in Support (Doc. 67), which plaintiff Ashawna D. Miles has opposed (Doc. 91). ARC contemporaneously filed an opposed Motion for Partial Judgment on the Pleadings and Brief in Support (Doc. 68). Shortly after ARC filed its motions, plaintiff filed an opposed Motion to Strike Unpled Affirmative Defenses in Defendant's Motion for Summary Judgment (Doc. 76). ARC thereafter filed an opposed Motion for Leave to Amend its Answer and Brief in Support (Doc. 77).

## ARC's Affirmative Defenses

The Court will first address the parties' arguments regarding ARC's affirmative defenses. Plaintiff's argument in its Motion to Strike and in its Response to ARC's Motion for Leave to Amend is that ARC waived the defenses of business necessity, undue hardship, failure to exhaust administrative remedies, and direct threat by failing to assert them in its Answer. (Doc. 76 at 1-2; Doc. 79 at 1).[1]

---

[1] The page numbers cited in this opinion are those found in the header of each document.

ARC responds that it did not rely on the business necessity defense in its Motion for Summary Judgment, contending that "it would not make sense" for ARC to do so because that defense applies only to disparate impact claims—which Miles has not asserted. (Doc. 78 at 3). If ARC did not intend to raise this defense in its Motion for Summary Judgment, then there is nothing to strike and no reason for Defendant to now add this defense to its Answer.

The Court also denies plaintiff's Motion to Strike and defendant's Motion for Leave to Amend as to the affirmative defense of undue hardship. As noted by defendant, the undue hardship defense is relevant to whether accommodations proposed by the employee are reasonable. (Doc. 78 at 7). "[I]f the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. . . . The employer must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) (internal quotations and citations omitted). Because the Court finds below that Miles has failed to present facially reasonable accommodations, consideration of any undue hardship defense is now unnecessary.

Plaintiff also seeks to strike defendant's arguments related to failure to exhaust administrative remedies. The Tenth Circuit has previously held that the "[e]xhaustion of administrative remedies under the Americans with Disabilities Act . . . is a jurisdictional prerequisite to suit." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105 (10th Cir. 2002). More recently, this characterization has been called into question, but not resolved. *See Wickware v. Manville*, 676 Fed. App'x 753, 767 n.4.

"If exhaustion is a jurisdictional requirement, the district court must always dismiss if there has been a failure to exhaust." *McQueen ex rel. McQueen v. Colo. Springs School Dist. No. 11*,

488 F.3d 868, 873 (10th Cir. 2007). Waiver is not an issue, because the defense of lack of subject matter jurisdiction cannot be waived. Fed. R. Civ. P. 12(h)(3).

Assuming exhaustion is not a jurisdictional requirement, this Court finds it appropriate to allow ARC to constructively amend its Answer to include this defense. While "the best procedure is to plead an affirmative defense in an answer or amended answer," the Tenth Circuit has held that a defendant may "'constructively'" amend the answer by means of the summary-judgment motion." *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (holding the district court properly considered qualified immunity defense that was first raised in defendant's motion for summary judgment). Amendment may be denied on grounds including prejudice to the plaintiff, undue delay, bad faith, or dilatory motive. *Id*.

District courts in this circuit have allowed amendment at the summary judgment stage and declined to find prejudice where the plaintiff has challenged the newly raised defenses on the merits. *See, e.g.*, *ROC ASAP, L.L.C. v. Starnet Ins. Co.*, No. CIV-12-461-D, 2014 WL 667833, at *5 (W.D. Okla. Feb. 20, 2014) (allowing statute of limitations defense at summary judgment where there was no prejudice to plaintiff, who had "adequate opportunity to address the defense"); *Ford v. Justice Alma Wilson Seeworth Acad.*, No. CIV-08-1015-D, 2010 WL 545871, at *2 (W.D. Okla. Feb. 9, 2010) (finding no waiver of qualified immunity defense where plaintiff opposed the defense in his response to motion for summary judgment); *Dopp v. Jones*, No. CIV-06-842-D, 2009 WL 3157353, at *2 (W.D. Okla. Sept. 29, 2009) (finding no waiver of defenses where plaintiff opposed them on the merits). Here, plaintiff rebutted ARC's failure to exhaust arguments as to both her failure-to-accommodate claim and her retaliation claim. (Doc. 91 at 30-33). For this reason, and because the Court has found no evidence of undue delay, bad faith, or dilatory

motive, the Court will consider this defense in its assessment of defendant's Motion for Summary Judgment.

The remaining issue before the Court is whether ARC's assertion of the direct threat defense,[2] which was raised in its Motion for Leave to Amend its Answer and Brief in Support (Doc. 77), is permissible.

Plaintiff did not directly rebut the direct threat defense in her Response to ARC's summary judgment motion. However, evidence submitted by plaintiff reflects that she was put on notice of the direct threat defense. Specifically, an email from Mr. Stephens dated December 29, 2014, provides: "At this point, with zero lifting, pulling, and pushing [restrictions,] this would put her and us at risk." (Doc. 91-12 at 37). Plaintiff also stated in her deposition that Rashan Stephens, her supervisor, "said he didn't want to have injured workers because it was more of a liability than it was an asset to have them at work." (Doc. 91-29 at 2 [Dep., p. 231]). Furthermore, since this case has been moved to the March 2018 trial docket, plaintiff has considerable time to prepare for this defense. Under the circumstances presented, the Court concludes that ARC may amend its Answer to include the direct threat defense.

For the above-stated reasons, plaintiff's Motion to Strike is **denied** and defendant's Motion for Leave to Amend is **granted in part**.

---

[2] The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "The assertion that an employee would pose a direct threat to the health and safety of others also can function as an affirmative defense under the ADA." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1268 n.10 (10th Cir. 2015); *see also Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290 (10th Cir. 2000).

## ARC's Motion for Summary Judgment

### I. Factual Background

The following facts are drawn in favor of the plaintiff.  Plaintiff was employed by ARC from July 7, 2007, until her termination on February 13, 2015.  (Doc. 67 at 7, ¶ 1).  At the time of her discharge, she was a Team Supervisor.  (*Id*.).  The job description of a Team Supervisor includes supervision of blood drives "to ensure an efficient, effective and compliant process." (Doc. 67-1).  The physical requirements for Team Supervisors "may include the ability to lift" and "push or pull heavy weights up and down ramps and stairs."  (Doc. 67-1 at 3).

On June 9, 2014, plaintiff injured her left shoulder while she was "helping unload a bed off of a cargo vehicle" at a blood drive.  (Doc. 67-2 at 13 [Dep., p. 59]).  Rashan Stephens, plaintiff's direct supervisor, allowed plaintiff to return to work while she was subject to ten-pound and twenty-pound lifting restrictions imposed by her physician.  (Doc. 91-8 at 8, ¶ 3).  Plaintiff's physician reduced her lifting restriction to one pound on September 3, 2014.  (Doc. 67-2 at 15-16 [Dep., pp. 61-62]).  That same day, Mr. Stephens directed plaintiff to go home because she "probably wouldn't be able to help much out at the mobile."  (*Id*.).

Plaintiff did not return to work after September 3, 2014.  That month, plaintiff began receiving temporary total disability benefits.  (Doc. 67-2 at 5 [Dep., p. 13]).  ARC contends that plaintiff was on a leave of absence for more than 23 weeks (Doc. 67 at 9, ¶ 11), while plaintiff asserts she was working from home for some of that time (Doc. 91 at 22).

In December 2014, plaintiff underwent surgery.  Plaintiff's surgeon, Dr. Robert Nebergall, thereafter restricted her from lifting, pushing, or pulling more than zero pounds, and from reaching above her shoulders.  (Doc. 67-2 at 17-18 [Dep., pp. 68-69]; Doc. 67-7).  Dr. Nebergall increased plaintiff's lifting, pushing, and pulling restrictions to one pound on January 21, 2015.  (Doc. 67-

8). ARC contends that the one-pound restriction rendered plaintiff incapable of performing many of the essential functions of the Team Supervisor position. (Doc. 67 at 13). Plaintiff asserts that the physical requirements of her position were not essential functions and argues that her restriction could be accommodated because it was limited to her left arm. (Doc. 91 at 20-25).

Before her termination, plaintiff contacted several members of ARC to ask about accommodations. (Doc. 91-12 at 5-6, 9 [Dep., pp. 71-72, 125], Doc. 91-10 at 8). Mary Ann Dodson, a Human Resources Advisor, told plaintiff on December 3, 2014, that ARC needed her physician to complete a medical questionnaire regarding what accommodations would enable plaintiff to perform her job functions. (Doc. 67-9). According to plaintiff, Dr. Nebergall refused to complete the questionnaire. (Doc. 67-2 at 48 [Dep., p. 127]). On December 15, 2014, Christine Hinnerichs, an Absence Management/Compliance Advisor, informed plaintiff that ARC's main concern was knowing how much additional time plaintiff's physician believed she required off from work. (Doc. 67-11).

On January 7, 2015, Ms. Dodson sent plaintiff a letter stating that ARC was unable to accommodate her zero-pound work restrictions. (Doc. 67-12). The letter further stated:

> We strongly encourage your physician to complete the accommodation paperwork. We would like to know if there are any workplace accommodations we could provide you that would allow you to return to work, and if those are not possible, provide the amount of time your physician advises you remain off of work.

(*Id.*). Ms. Hinnerichs spoke with plaintiff on January 9, 2015, and told her that ARC needed her physician's opinion regarding workplace accommodations or, if no such accommodations were available, how much additional time plaintiff needed off from work. (Doc. 67-13). ARC asserts that as of February 13, 2015, plaintiff had failed to provide any physician-approved workplace accommodations or a physician's opinion regarding her return to work. (Doc. 67 at 10, ¶ 18). Plaintiff did, however, provide ARC with physician work status reports following each of her

doctor's appointments and also suggested accommodations herself.  (Doc. 91 at 16; Doc. 91-14 at 16 [Dep., 143]).

Plaintiff was terminated on February 13, 2015.  Plaintiff's termination letter reflects that she was terminated as a result of her failure to provide ARC with information related to accommodations and a return date.  (Doc. 67-14).  Plaintiff continued to receive temporary total disability benefits through March 2016, with the exception of several months in 2015.  (Doc. 67-2 at 5 [Dep., p. 13]).

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material only if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  There is no genuine issue of material fact "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  The district court thus must determine "whether the evidence presents a sufficient disagreement [about that material fact] to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The non-movant's evidence should be taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.* at 255.

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ."  *Id.*  "[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

## III. Discussion

Plaintiff's Complaint asserts disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; intentional infliction of emotional distress; violation of her personal rights pursuant to *Okla. Stat.* tit. 76, § 6; and negligent training, hiring, and supervision. ARC has moved for summary judgment on all of plaintiff's claims.

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Because discrimination under the ADA can give rise to distinct claims, this Court "must first determine what type of ADA claim is at issue in this case." *See Punt v. Kelly*, 862 F.3d 1040, 1047 (10th Cir. 2017). Miles appears to be asserting three different ADA claims, although she does not list these claims as separate counts in her Complaint. (Doc. 2 at 6-8). ARC, in its Motion for Summary Judgment and Brief in Support (Doc. 67), treats Miles's Complaint as raising a wrongful termination claim, a failure-to-accommodate claim, and a retaliation claim. This Court will do the same and will address each in turn.

### A. Wrongful Termination

Where, as here, there is no direct evidence of discrimination, the Court applies the three-step, burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] Under this framework, plaintiff must first establish a prima facie case of discrimination. *See Mason*, 357 F.3d at 1118. If the plaintiff establishes her prima facie case, the burden of production then shifts to defendant "to offer a legitimate nondiscriminatory reason for its

---

[3] The Tenth Circuit has held that the *McDonnell Douglas* framework is applicable to ADA cases. *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1164 (10th Cir. 2002).

employment decision." *Morgan v. Hilti*, 108 F.3d 1319, 1324 (10th Cir. 1997). "[T]he burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief.'" *Id.*

In order to establish a prima facie case of discrimination, an ADA plaintiff must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job; and (3) she was discriminated against because of her disability. *Osborne*, 798 F.3d at 1266. A plaintiff's burden at the prima facie stage is "not onerous." *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

ARC does not challenge the first element, plaintiff's status as a disabled individual under the ADA. However, ARC argues that plaintiff cannot prove she was qualified to perform the essential functions of her job with or without accommodations. (Doc. 67 at 11).

### 1. Judicial Estoppel

First, ARC cites Supreme Court authority for the proposition that plaintiff's acceptance of workers' compensation temporary total disability ("TTD") benefits estops her from pursuing an ADA claim. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). In *Cleveland*, the Supreme Court held that an applicant's application for and receipt of Social Security Disability Insurance ("SSDI") benefits do not automatically judicially estop a subsequent ADA claim if the plaintiff is able to sufficiently explain any inconsistency in her positions. *Id.* at 807.

Plaintiff responds that *Cleveland* is distinguishable because plaintiff never applied for SSDI benefits nor did she claim a complete inability to work. (Doc. 91 at 13). While the Tenth Circuit has not addressed whether *Cleveland* is limited to SSDI claims, numerous federal courts

have determined that the Supreme Court's reasoning in *Cleveland* is applicable to workers' compensation claims. *See, e.g.*, *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 7 (2d Cir. 1999); *Hansen v. Jerome Joint Sch. Dist. No. 261*, No. 1:11-cv-00073-CWD, 2012 WL 1599915, at *7 (D. Idaho May 7, 2012); *McDonald v. Mt. Perry Foods, Inc.*, No. C2:09-CV-0779, 2011 WL 3321470, at *12 (S.D. Ohio Aug. 2, 2011); *Desmond v. Yale–New Haven Hosp., Inc.*, 738 F. Supp. 2d 331, 345 (D. Conn. 2010); *Rogers v. Wal-Mart Stores E., L.P.*, No. 1:06-cv-84, 2008 WL 552841, at *10 (E.D. Tenn. Feb. 26, 2008); *Nodelman v. Gruner & Jahr USA Pub.*, No. 98 CIV. 1231(LMM), 2000 WL 502858, at *8 n.4 (S.D.N.Y. Apr. 26, 2000).

Nonetheless, ARC's argument that plaintiff's ADA claim is estopped solely by virtue of her application and receipt of TTD benefits ignores the Supreme Court's rejection of a presumption of estoppel based upon a plaintiff's application and receipt of disability benefits. To be clear, the Supreme Court determined that the SSDI and ADA claims did "not inherently conflict to the point where courts should apply a special negative presumption," and instead directed courts to engage in a fact-intensive inquiry to determine whether a genuine conflict exists between the plaintiff's alleged contrary positions. *Cleveland*, 526 U.S. at 802-03. "When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Id.* at 807. *Cleveland* requires the plaintiff's explanation to be "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation'" in order for the ADA claim to proceed. *Id.*

Plaintiff left work on September 3, 2014 and accepted temporary total disability benefits from September 3, 2014 through March 2016, with the exception of several months in 2015

following her termination. (Doc. 67-2 at 5 [Dep., p. 13]). In *Cleveland*, the Court found that a genuine conflict existed because the plaintiff made several affirmative representations to the Social Security Administration that she was disabled and unable to work for the period of time corresponding to the same period of time covered by her ADA claim. *Cleveland*, 526 U.S. at 807. By contrast, ARC has not pointed to any representations or legal positions on plaintiff's part that conflict with her ADA claim—ARC simply argues that plaintiff's receipt of TTD benefits is "facially inconsistent" with her ADA claim. (Doc. 67 at 12). Under *Cleveland*, this is not enough. While it may be possible that plaintiff's position in her workers' compensation lawsuit is contradictory to her present position in this case, the Court finds no evidence in the record to support such an inference. In the absence of any genuine conflict in plaintiff's positions or statements, plaintiff is not required to provide any explanation under *Cleveland*, and her ADA claim is not estopped.

### 2. Plaintiff as a Qualified Individual under the ADA

The Court next addresses the remainder of ARC's arguments as to plaintiff's prima facie case. The second element, whether plaintiff was qualified to perform the essential functions of her job with or without accommodations, requires the Court to undertake a two-part analysis:

> First, the court determines whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable her to perform those functions.

*Osborne*, 798 F.3d at 1267 (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003)). "The plaintiff bears the burden of showing she is able to perform the essential functions of her job.'" *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004).

"Essential functions" are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). This term "does not include the marginal functions of the position." *Id*. A job function may be considered essential for different reasons, including: (1) "the reason the position exists is to perform that function," (2) there are a "limited number of employees available among whom the performance of that job function can be distributed," and/or (3) "the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id*. at § 1630.2(n)(2). The evidence used in determining whether a function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id*. at § 1630.2(n)(3). "Though 'we weigh heavily the employer's judgment regarding whether a job function is essential,' the employer's judgment is not dispositive." *Iselin v. Bama Cos., Inc.*, 690 Fed. App'x 593, 596 (10th Cir. 2017) (quoting *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009)).

Miles has provided sufficient evidence to present an issue of fact regarding her ability to perform the essential functions of her job without reasonable accommodation. Thus, ARC is not entitled to summary judgment as to Miles's wrongful termination claim.

At the time of her termination, Miles was under a one-pound restriction. Her last Activity Status Report before the termination, dated January 21, 2015, stated, "Return to work on 01/21/2105," and provided three specific restrictions: (a) "no lifting over 1 lbs.," (b) "No pushing and/or pulling over 1 lbs. of force," and (c) "No reaching above shoulders." (Doc. 91-11). These

restrictions pertained to her left arm only. (*Id.*) ARC maintains that these restrictions prevented her from performing phlebotomies, taking donors' health histories, and assisting in setting up and tearing down the mobile blood drives—tasks that, according to ARC, are essential functions of the Team Supervisor position. (Doc. 67 at 8, 13-17).

Miles's inability to perform phlebotomies while under these restrictions is undisputed. "[I]f you have a donor that happens to fall out or pass out," explained Miles's supervisor, "you need to have both arms to catch that donor." (Doc. 67-6 at 4 [Dep., p. 84]). A person conducting a phlebotomy may also have to reach upward to relax a donor or control his or her arm. (Doc. 91-8 at 14 [Dep., p. 279]).

Miles does not appear to argue that she could have performed phlebotomies with the one-pound restrictions, but she maintains that this task was *not* an essential function of a Team Supervisor. In her deposition, Miles suggested that she "could have still worked the blood drives [with the one-pound restrictions] because supervisors . . . have the option of whether or not we want to be in what we call, the flow. And so we don't necessarily have to be in the flow or in direct contact with a donor." (Doc. 91-9 at 9 [Dep., p. 241]). She described her role as Team Supervisor as "more of a P.R., more customer service" role, for which she would "walk around and check on the donors, say hi to them, greet them, [and] make sure that everything is okay." (Doc. 67-2 at 9, [Dep., p. 37]). In her affidavit, Miles stated that she "had a Team Leader and Line Staff that reported to [her] who carried out the physical work and phlebotomy" and that she "had no physical job duties, or pound lifting requirements, that were regular or essential to [her] job as a Team Supervisor" (Doc. 91-8 at 12, ¶ 15).

ARC has provided some evidence that performing phlebotomies was an essential function of Miles's job. Miles's supervisor stated in his deposition that "Team Supervisors had to perform

functions like phlebotomy" on top of their supervisory functions. (Doc. 67-6 at 3 [Dep., p. 83]). Furthermore, the Team Supervisor job description clearly states that "[p]hysical requirements may include the ability to lift, push or pull heavy weights up and down ramps and stairs." (Doc. 67-1 at 3).

Lastly, current employees in the Team Supervisor role have declared that they regularly perform phlebotomies on donors. (Doc. 67-4 at 2, ¶ 5; Doc. 67-5 at 3, ¶ 8). Miles herself admits that in an emergency or when there were more donors than expected, she would get involved in the phlebotomy process and draw blood. (Doc. 67-2 at 9 [Dep., p. 37]).

It is also clear that Miles was unable to set up and tear down equipment at the blood drives under the one-pound restrictions. Miles again argues that this task was not an essential function of her job as a Team Supervisor. Miles stated in her deposition that "[t]he staff is responsible for tearing down the beds, cleaning the beds and getting the mobile back to the van." (Doc. 91-9 at 15 [Dep., p. 39]). Though it "wasn't so much of an expectation" that she do so, she admits she was "[s]ometimes" involved in tearing down equipment after a blood drive. (*Id*. at 14 [Dep., p. 38]). Notably, the injury that caused her disability occurred when she was helping unload equipment. (Doc. 91-5 at 8 [Dep., p. 59]). Current ARC employees in the Team Supervisor role stated that they help set up and tear down the mobile blood drives on a regular basis. (Doc. 67-4 at 2, ¶ 5; Doc. 67-5 at 3, ¶ 8). Cynthia Leonard, who became a Team Supervisor around 2005 and later held the higher position of Operations Supervisor, states in her affidavit that during the entire time she has been employed as either Team Supervisor or Operations Supervisor she has "regularly assisted in the process of setting up and tearing down mobile blood drives." (Doc. 67-5 at 3, ¶ 8). Linda Billey, who became Team Supervisor in 2015, states that she "assist[s] on a daily basis in the process of setting up and tearing down mobile blood drive." (Doc. 67-4 at 2, ¶ 5).

Miles, however, has presented evidence establishing that there is a genuine dispute of material fact, precluding summary judgment.  Miles's supervisor, Mr. Stephens, stated in his deposition that Miles was at work, performing all of her duties, with a ten-pound restriction soon after the injury occurred.  (Doc. 91-7 at 3-4 [Dep., pp. 125-26]).  It was not until Miles's restriction was changed to one pound in September that Stephens sent her home, telling her she likely "wouldn't be able to help much out at the mobile."  (Doc. 91-7 at 7 [Dep., p. 62]).  Miles also claims that she was able to do her job after gynecological issues in 2013 left her unable to do heavy lifting.  (Doc. 67-2 at 10-11 [Dep., pp. 56-57]).  Construing the evidence and all reasonable inferences in favor of plaintiff, catching falling donors and lifting and carrying blood drive equipment is heavy lifting that would surpass a ten-pound limitation.  Given that Miles was able to do her job under the ten-pound restriction for several months in 2014—and was able to do her job without any heavy lifting for several months in 2013—there is evidence from which a reasonable jury could conclude that performing phlebotomies and assisting with equipment were not, in fact, essential functions of the job.  "An employee's ability to perform the essential functions of a job in the past indicates an ability to perform that job in the present."  *Iselin*, 690 Fed. App'x at 596.

Furthermore, there is a fact issue as to whether Miles was able to complete health histories with her restrictions.  Miles maintains that she could have done so (Doc. 67-2 at 75 [Dep., p. 243]), while her supervisor, Mr. Stephens, suggests not (Doc. 91-23 at 6 [Dep., p. 85]).  Stephens points out that a person must be able to take a donor's blood pressure, hold a stethoscope, and "take a pulse from different directions" in order to complete a health history.  (*Id*.).  But there is no evidence presented that Stephens spoke with Miles about her ability to do these things based on her specific restrictions, and it is not clear apparent that these restrictions would have prevented

her from taking a person's blood pressure or pulse, or from holding a stethoscope. Stephens seems only to be speaking in the abstract, which is not sufficient to resolve this question of fact.

In general, "an employer's failure to engage in the interactive process will often make it difficult to resolve a case for the employer on summary judgment." *Valdez v. McGill*, 462 Fed. App'x 814, 819, 819 n.5 (10th Cir. 2012). Not a single ARC employee remembers discussing Miles's restrictions with her or exploring what her capabilities might have been. (Doc. 67 at 22). The evidence reflects a genuine dispute of material fact as to whether plaintiff could perform the essential functions of her job without reasonable accommodation, precluding summary judgment on her wrongful termination claim.

### 3. Discriminatory Intent:

As explained above, plaintiff has established the first two prongs of her prima facie case: she is undisputedly disabled and has presented evidence from which a reasonable jury could find that she was otherwise qualified for the position. To establish the third prong, "the plaintiff must show that she was terminated because of her disability, or that the employer terminated the plaintiff 'under circumstances which give rise to an inference that the termination was based on her disability.'" *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 748 (10th Cir. 1999). Assuming the circumstances of Miles's termination gives rise to such an inference, the burden shifts to ARC. *See Morgan*, 108 F.3d at 1324. ARC, in turn, has given a facially legitimate and non-discriminatory reason for terminating her; namely, plaintiff failed to return ADA accommodation paperwork that had to be completed by her physician. (Doc. 67 at 25; Doc. 67-14).

The burden then shifts back to the plaintiff to "establish a genuine dispute as to whether [her employer's] actions were pretextual. *Morgan*, 108 F.3d at 1324. Pretext may be shown "by demonstrating the proffered reason is factually false, or that discrimination was a primary factor

in the employer's decision." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotations omitted). Plaintiff may show "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reasons, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. (quoting *Tabor*, 703 F.3d at 1216). A plaintiff may also demonstrate that the employer acted contrary to a company policy or practice. *Id*.

Miles has succeeded in carrying this burden. Though Miles admits she was unable to return the requested accommodation paperwork because her doctor felt uncomfortable filling it out (Doc. 67-2 at 20 [Dep., p. 74]), she points to ARC's "Return to Work" policy for "employees that have physical limitations resulting from an occupational injury or illness." (Doc. 91-14). This policy provides that employees are responsible for:

> 1. Providing management with work restrictions and supporting documentation as prescribed by the medical provider within one business day of treatment.
> 2. Maintaining contact with their department supervisor and Loss Control as injury status changes.
> …
> 6. Ensuring the work status report outlining medical restrictions and medical treatment schedule has been promptly provided to Loss Control and their supervisor.
> 7. Notifying their supervisor and Human Resources (HR) if they need a reasonable accommodation. . . .

(Doc. 91-14 at 3-4). A reasonable jury could find that Miles met her responsibilities under this policy, and, therefore, ARC's decision to terminate her nonetheless was inconsistent with this policy. Miles stated in her deposition that she always called to make sure the Human Resources Advisor received her Work Activity Status Reports. (Doc. 91-12 at 3 [Dep., p. 66]). She also filled out a medical release form so that ARC could contact her doctor directly in regard to potential accommodations. (Doc. 91-14 at 16 [Dep., p. 143]).

Furthermore, Miles presents evidence of frequent contact with various ARC employees. She called her own supervisor, Mr. Stephens; Ms. Dodson, the Human Resources Advisor; Ms. Reed, the Safety Engineer, and Ms. Hinnerichs, the Absence Management/Compliance Advisor—all to see if they could "help [her] with being accommodated." (Doc. 91-12 at 10 [Dep., p. 234]). Construing the facts in plaintiff's favor, she met her responsibilities under ARC's Return to Work policy. This gives rise to the reasonable inference that ARC used the additional paperwork as pretext for her termination.[4]

**B. Failure-to-Accommodate Claim**

Plaintiff appears to assert a failure-to-accommodate claim as an alternative theory for her disability discrimination claim. ARC argues that summary judgment as to plaintiff's accommodation claim is proper because plaintiff failed to exhaust her administrative remedies. Specifically, ARC asserts that the claim is not within the scope of her EEOC charge nor was it timely filed. (Doc. 67 at 26). ARC further argues that plaintiff is unable to prevail on her accommodation claim because ARC accommodated her by allowing her to take leave while holding her position open, and because no other accommodations were available. (*Id.* at 26-27).

"A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005). The purposes of the exhaustion requirement are: "1) to give notice of the alleged violation to the

---

[4] Defendant argues in its Supplemental Brief (Doc. 116) that it is entitled to summary judgment on plaintiff's ADA claims because Miles claimed in her state court petition that ARC "terminated [her] due solely to her continued absence from work." (Doc. 116-1 at 4-5, ¶ 13). Since parties are permitted to plead alternative claims, regardless of consistency, defendant is not entitled to summary judgment on this basis. *See* Fed. R. Civ. P. 8(d)(2)-(3); *Okla. Stat.*, tit. 12, § 2008(E)(2).

charged party; and 2) to give the EEOC an opportunity to conciliate the claim." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1185 (10th Cir. 2007) (quoting *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994), *abrogated on other grounds by Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003)). "In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows from the rule that 'each discrete incident' of alleged discrimination or retaliation 'constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted.'" *Id.* at 1186 (quoting *Martinez*, 347 F.3d at 1210). Courts are to liberally construe EEOC charges in assessing whether administrative remedies have been exhausted. *Id.*

The ADA incorporates the procedural rules of Title VII and requires an individual to file a timely administrative claim within 300 days of the challenged action. *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003); *see also* 42 U.S.C. § 12117(a). For purposes of calculating the applicable statutory time period, a "discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).

Plaintiff's amended EEOC charge indicates discrimination based on retaliation and disability. (Doc. 67-21 at 5). The earliest date of unlawful discrimination is listed as February 10, 2015, and the latest date of discrimination is February 13, 2015. (*Id.*). Plaintiff did not check the "continuing action" box on either charge. It is undisputed that plaintiff was terminated on February 13, 2015. Although plaintiff asserted that she was not accommodated in her original and amended EEOC charges,[5] ARC properly points out that plaintiff's EEOC charges do not allege any dates

---

[5] Plaintiff's original charge states that ARC "refused to accommodate" her temporary restrictions. (Doc. 67-21 at 4). Her amended charge provides the following: "My employer would not give accommodations for my temporary medical restrictions while I healed from the on-the-job injury." (*Id.* at 6).

that correspond with the three-day period of alleged discrimination. Rather, it appears that the asserted timeframe in plaintiff's charge relates solely to her termination.

Nonetheless, mindful of the liberal construction afforded to EEOC charges, the Court finds that plaintiff's specific allegations regarding her denial of accommodation were sufficient to put ARC on notice of her failure to accommodate claim and could reasonably be expected to follow the charge of discrimination. Defendant cites *Becerra v. Earthlink, Inc.*, in which the U.S. District Court for the District of Kansas concluded that "an employer's rejection of an employee's proposed accommodation is a discrete act that must be the subject of a charge of discrimination within 300 days of the employer's rejection." 421 F. Supp. 2d 1335, 1343 (D. Kan. 2006) (relying on *Elmenayer v. ABF Freight Sys., Inc.*, 318 F. 3d 130 (2d Cir. 2003) and *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003)). Yet, ARC never responded to plaintiff's requests for accommodation other than by demanding that her doctor fill out the medical questionnaire. Construing the facts in favor of Miles, her termination was ARC's ultimate denial of her repeated requests for accommodation. Thus, plaintiff's failure-to-accommodate claim falls within the scope of the EEOC charge and is timely.

To survive summary judgment on a failure-to-accommodate claim, "the employee must make an initial showing that '(1) she is disabled; (2) she is "otherwise qualified"; and (3) she requested a plausibly reasonable accommodation.'" *Punt*, 862 F.3d at 1050 (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012)). For this type of claim, there is no need to present evidence of discriminatory intent because "failure to provide a reasonable accommodation to a qualified employee with a disability is inherently 'on the basis of [the] disability,' 42 U.S.C. § 12112(a), regardless of the employer's motivation." *Id*. at 1048. "Once the employee produces evidence sufficient to make a facial showing on . . . her prima facie case, the burden of production

shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999), *quoted in Punt*, 862 F.3d at 1050.

"[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of [her] job." *Hudson v. MCI Telecomm. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996). If she could already perform the essential functions of her job under her restrictions—as a reasonable jury could infer from the evidence—then there would be no need for accommodations and, thus, no claim against ARC for failure to provide them. Alternatively, if physically demanding tasks such as performing phlebotomies and assisting with equipment are essential functions that she could not perform under her one-pound restrictions, she has failed to propose facially reasonable accommodations that would enable her to perform those tasks.

In her Complaint, Miles proposed as accommodations (1) "time off work while healing and recovering" and (2) "light or restricted work duty." (Doc. 2 at ¶ 19). In her deposition, she further suggested that she could have worked in a "different department" or ARC's fixed facility. (Doc. 67-2 at 73 [Dep., p. 241]).

While "a brief leave of absence for medical treatment or recovery can be a reasonable accommodation . . . [t]here are two limits on the bounds of reasonableness for a leave of absence." *Robert v. Bd. of Cty. Comm'rs of Brown Cty., Kan.*, 691 F.3d 1211, 1218 (10th Cir. 2012).

> The first limit is clear: The employee must provide the employer an estimated date when she can resume her essential duties. Without an expected end date, an employer is unable to determine whether the temporary exemption is a reasonable one. The second is durational. A leave request must assure an employer that an employee can perform the essential functions of her position in the 'near future.'

*Id.*  There is no indication that Plaintiff provided an estimated date when she could resume her essential duties; she only provided an estimated date of "maximum medical improvement." (Doc. 67-2 at 23, [Dep., p. 77]; Doc. 67 at 17, n.1).  This is insufficient, since it is impossible to tell whether achieving her maximum medical improvement would have changed her necessary restrictions.  As defendant states, "the fact that a body part is no longer healing does not mean it is no longer impaired." (Doc. 67 at 17, n.1).

Plaintiff's proposed accommodation of "light or restricted work duty" also falls short if the aforementioned physical tasks are deemed to be essential functions of the Team Supervisor role. The Tenth Circuit has made clear that "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason*, 357 F.3d at 1122.

As to Miles's suggestion of working in a different department or the fixed facility, "[t]he ADA does not require an employer to create an assignment or position, and reassignment is not required when the employee is not qualified for a vacant job, no vacancy existed, or reassignment would have been a promotion." *Gandall v. Flightsafety Int'l, Inc.*, No. 12-CV-82-JED-PJC, 2013 WL 2444715, *5 (N.D. Okla. June 5, 2013).  Miles has not presented evidence that a vacancy existed in another department or at the fixed facility.  *See id.*  Her proposed accommodations, therefore, do not create a genuine dispute of fact in regard to the existence of reasonable accommodations if she was otherwise unable to perform the essential functions of her job.  Thus, defendant is entitled to summary judgment on plaintiff's failure-to-accommodate claim.

### C.  Retaliation

In her Complaint, plaintiff alleges that ARC acted intentionally to "to discriminate, retaliate and unfairly treat Miles for her pursuit of her rights under applicable state and federal laws, leading

to her improper and intentional job termination."  (Doc. 2 at ¶ 11).  She also alleges ARC "would not and did not give accommodations for Miles' temporary medical restrictions" and that ARC did so "in an effort to discriminate, retaliate and wrongfully terminate Miles' employment."  (*Id*. at ¶ 13).  In her deposition, Miles answered "yes" when asked if ARC retaliated against her because she complained she was being treated differently and because she complained that she was not being accommodated.  (Doc. 91-20 at 11 [Dep., p. 277]).

ARC contends that Miles failed to exhaust her administrative remedies as to this claim.  (Doc. 67 at 27).  Yet, in her EEOC charge, Miles checked the box for retaliation and stated that she believes she has "been discriminated against, and retaliated against, because I am a person with a disability, and/or perceived by my employer as disabled . . . ."  (Doc. 67-21 at 5-6).  Given that courts are to "liberally construe charged filed with the EEOC," *Jones*, 502 F.3d at 1186, this Court finds that Miles exhausted her administrative remedies as to her retaliation claim.

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  To establish a prima facie case of retaliation under the ADA, an employee must prove: "(1) that she engaged in an activity protected by the statute; (2) that 'she was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity;' [and] (3) that there was a causal connection between the protected activity and the adverse action."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).

Requesting accommodations has been considered a protected activity under the ADA.  *See Butler*, 172 F.3d at 752 (plaintiff requested an accommodation to his work schedule due to depression); *Selenke*, 248 F.3d at 1265 (plaintiff requested improvements to ventilation system

due to breathing difficulties).  Miles has presented evidence that she requested to be accommodated multiple times.  (Doc. 91-12 at 2-7, 9-10 [Dep., pp. 65-66, 70-73, 125, 234]).  Her subsequent termination satisfies the second element of her prima facie case.

Where Miles fails to establish a genuine dispute of fact is the third element of a retaliation claim.  The only evidence Miles presents to establish a causal connection between her requests for accommodation and her termination is her answer to a leading question by counsel:

> Q:    Are you alleging to our judge and jury that they retaliated against you because you complained to them that you weren't being accommodated?

> A:    Yes, I'm—I'm—they complained—they retaliated against me because I filed a workman's comp claim is why they retaliated against me.

> Q.    But I'm talking about the Americans with Disability Act now.  Do you – are you alleging to the judge and jury that they retaliated against you ending in termination?

> A.    Yes.

(Doc. 91-20 at 11 [Dep., p. 277]).  No other evidence, including the timing of her termination, suggests a causal connection between plaintiff's requests for accommodation and ARC's eventual employment decision.  The Tenth Circuit has provided that temporal proximity "may be insufficient, standing alone, to raise an inference of retaliatory motive."  *Butler*, 172 F.3d at 752.  Any exception to this rule "would be limited to matters occurring within days, or at most, weeks of each other."  *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008), *quoted in Hennagir*, 587 F.3d at 1266-67.

In this case, it is difficult to surmise from the evidence when Miles's accommodation requests took place.  Miles spoke with Ms. Dodson on the telephone about accommodations, but it is unclear from the deposition transcript whether this conversation happened before or after November 2014.  (Doc. 91-12 at 2-5).  She also spoke with Ms. Hinnerichs more than once

between November 2014 and her termination in February 2015. (Doc. 91-12 at 6-7). Miles

contacted Mr. Stephens and Ms. Reed, but it is again unclear when these conversations took place.

(Doc. 91-12 at 9 [Dep., p. 125]; Doc. 91-12 at 10 [Dep., p. 234]). The one firm date presented by

the evidence is December 24, 2014—the day on which Miles sent an email to Ms. Dodson and Mr.

Stephens asking if she could be accommodated. (Doc. 91-10 at 8).

Plaintiff has failed to present evidence of a close temporal proximity between plaintiff's

requests for accommodation and her termination. With no other circumstantial or direct evidence

suggesting a causal connection, plaintiff has failed to establish her prima facie case. Defendant's

Motion for Summary Judgment is thus granted as to plaintiff's retaliation claim.

### D. Intentional Infliction of Emotional Distress

Defendant has also moved for summary judgment as to plaintiff's claim of intentional

infliction of emotional distress. (Doc. 67 at 29-30). Plaintiff, in turn, points to a number of alleged

acts by defendant to support her claim, including:

- Miles was "set up" to be terminated by her supervisor, Rashan Stephens,
- ARC ignored its own policies for injured employees,
- ARC ignored Miles's accommodation requests,
- Stephens increased the acceptable pound limit for returning to work to 15 pounds, and
- Stephens fired Miles before her upcoming doctor appointment.

(Doc. 91 at 33). Plaintiff contends that she has suffered emotional distress as a result, citing weight

fluctuation (Doc. 91-33 at 3 [Dep., p. 211]), sleep loss (*id*. at 6 [Dep., p. 215]), hair loss (*id*. at 7,

[Dep., p. 220]), stomach pain (*id*. at 8 [Dep., p. 222]), and nausea (*id*. [Dep., p. 222]).

Oklahoma recognizes intentional infliction of emotional distress as an independent tort,

"governed by the narrow standards of Restatement (Second) of Torts § 46." *Gaylord*

*Entertainment Co. v. Thompson*, 958 P.2d 128, 149 (Okla. 1998). In order to prevail, a plaintiff

must establish that the defendant's conduct may reasonably be regarded as "so outrageous in

25

character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Eddy v. Brown*, 715 P.2d 74, 75 (Okla. 1986) (quoting Restatement (Second) of Torts §46, cmt. d (Am. Law Inst. 1977)). Liability for this tort does not extend "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id*. at 77. Thus, it is the trial court's responsibility to serve as a gatekeeper by making an initial determination of whether a reasonable jury could find the defendant's conduct to be "sufficiently extreme and outrageous to meet the § 46 standards." *Gaylord Entertainment*, 958 P. 2d at 149.

The actions attributed to defendant in this case are insufficient as a matter of law to support an intentional infliction of emotional distress claim. In *Eddy*, the plaintiff-employee complained that his employer had, among other things, inefficiently handled his workers' compensation claim, refused him vacation time, reduced his pay by reassigning him to train other employees and taking him off the graveyard shift, required him to submit to a hearing test, and harassed him about medical documentation. 715 P.2d at 76. The Oklahoma Supreme Court found this conduct could not reasonably be regarded as so extreme and outrageous as to justify submitting the claim to a jury. *Id*. at 77. Even when employees have been subjected to lewd remarks and profanities at the workplace, Oklahoma courts have found insufficient support for this type of claim. *See Gabler v. Holder & Smith, Inc.*, 11 P.3d 1269, 1280 (Okla. Civ. App. 2000); *Anderson v. Okla. Temporary Servs., Inc.*, 925 P.2d 574, 577 (Okla. Civ. App. 1996). Miles's various allegations may support her ADA claim, but they do not represent extreme and outrageous conduct as defined by Oklahoma common law.

### E. *Okla. Stat.* tit. 76, § 6

Plaintiff's third count in her Complaint is a claim under *Okla. Stat.* tit. 76, § 6, which states, "Besides the personal rights mentioned or recognized under law, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations."

Miles provides no evidence of bodily restraint or harm. She likewise fails to demonstrate personal insult or defamation. She alleges that her supervisor told the staff that she would not be returning after her termination (Doc. 91-34 at 4, [Dep., p. 172]). Yet, it is difficult to see how this statement could be construed as an insult at all, much less an actionable affront to plaintiff's rights. The Oklahoma Supreme Court has made it clear that "[i]f the law allowed liability based upon mere insults or indignities, there would be great danger of frivolous claims." *Breeden v. League Servs. Corp*, 575 P.2d 1374, 1376 (Okla. 1978). Also, under Oklahoma law, "[c]ommunication inside a corporation, between its officers, employees, and agents, is never a publication for the purposes of actions for defamation." *Thornton v. Holdenville General Hospital*, 2001 OK CIV APP 133, ¶ 11, 36 P.3d 456, 460.

Furthermore, Miles's allegation that Stephens adversely impacted her search for new employment (Doc. 91 at 34) is utterly unsupported by the evidence. Miles admitted in her deposition that she has no independent knowledge of whether her potential employers had a conversation with him. (Doc. 67-2 at 66 [Dep., p. 171]). She, instead, is merely speculating based on not receiving a job offer from these employers. (*Id.*).

Lastly, Miles contends that the humiliation at being fired, as well as the financial stress of losing her job, has injured her relationships with her husband, church, and grandchildren. (Doc. 91 at 34). However, this is not the type of injury to personal relations contemplated by § 6. In

*Nash v. Baker*, 522 P.2d 1335, 1338 (Okla. Civ. App. 1974), the court declared that title 76, § 6 "must be construed together with the specific section on 'Wrongs Against Personal Relations,'" that provides:

> The rights of personal relations forbid:
> 1. The abduction of a husband from his wife, a wife from her husband or of a parent from his child.
> 2. The abduction or enticement of a child from a parent, or from a guardian entitled to its custody, or of a servant from his master.
> 3. An injury to a servant.

Okla. Stat., tit. 76, § 8 (2017). Clearly, Miles has not alleged interference with these specific rights of personal relations.

Because plaintiff has failed to establish a genuine dispute of material fact as to her claim under this Oklahoma statute, defendant's Motion for Summary Judgment is granted as to this claim.

### F.  Negligent Hiring, Supervision, and Retention

Under Oklahoma law, "the theory of negligent hiring and retention is available in a nonvicarious liability case or in a case where vicarious liability has not been established." *Jordan v. Cates*, 935 P.2d 289, 293 (Okla. 1997). When an employer stipulates to vicarious liability under the *respondeat superior* doctrine, "the stipulation makes any other theory of imposing liability on the employer unnecessary and superfluous." *Id. See also Aldridge v. Indian Elec. Co-op*, No. 07-CV-633-HDC-PJC, 2008 WL 1777480, *5 (N.D. Okla. April 17, 2008). In this case, ARC has stipulated that its liability for terminating Miles, if any, would fall under the doctrine of *respondeat superior.* (Doc. 67 at 31). As a result, plaintiff's negligent hiring, supervision, and retention claim is superfluous, and defendant's Motion for Summary Judgment is granted as to this claim.

**IV. Conclusion**

Defendant's Motion for Summary Judgment (Doc. 67) is hereby **granted** as to plaintiff's claims of failure-to-accommodate and retaliation under the ADA, as well as to her claims of intentional infliction of emotional distress, violation of her personal rights pursuant to *Okla. Stat.* tit. 76, § 6, and negligent training, hiring, and supervision. The Motion for Summary Judgment is **denied** as to plaintiff's wrongful termination claim.

Plaintiff's Motion to Strike (Doc. 76) is **denied**, and defendant's Motion for Leave to Amend (Doc. 77) is **granted in part**. ARC's Motion for Partial Judgment on the Pleadings and Brief in Support (Doc. 68), which is largely duplicative of its summary judgment motion, is now **moot**.

SO ORDERED this 29th day of September, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE